IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

MADELINE GUADARRAMA

    Plaintiff

    v

MVM SECURITY SERVICES, INC., et al

    Defendants

**Civil No. 07-1468 (SEC)**

**OPINION AND ORDER**

Pending before this Court are two motions for summary judgment (Dockets ## 36, 37, 62, and 63) filed by Defendant MVM Securities Services, Inc. ("MVM") and Plaintiff's oppositions thereto (Docket # 42). After considering all the filings and the applicable law, for the reasons stated below, Defendants' motions for summary judgment will be **DENIED**.

**Factual Background**

Plaintiff, Madeline Guadarrama, worked as a security guard for MVM at the General Services Administration ("GSA") Federal Center in Guaynabo, Puerto Rico, between November 2003 and May 16, 2006. MVM states that Guadarrama's employment with the company was terminated, ". . . specifically for making fraudulent entries on official documents [(her time sheets)]." See Docket # 36-2 ("D.S.U.F.M. I"), ¶ 16. While Guadarrama does not dispute that there were irregularities with her timesheets, she alleges that this incident was used as a pretext, and her dismissal was ". . . discriminatory based on sex, and in reprisal for engaging in protected activity." See Docket # 41-2 ("O.S.U.M.F. I"), ¶ 16.

**CIVIL NO. 07-1468 (SEC)**                                                                                         **Page 2**

Accordingly, Guadarrama filed the present action against MVM under Puerto Rico's anti-discrimination and anti-retaliation statutes, Law No. 100 of June 30, 1959, P.R. Laws Ann. tit., 29 § 146 (2002) ("Law 100"), and Puerto Rico Law No. 115 of December 20, 1991, P.R. Laws Ann. tit. 29, § 194a(a) (2002) ("Law 115"). She subsequently amended her complaint to include an additional retaliation claim under the Federal Labor Standards Act, 29 U.S.C. §§ 201-219.[1]. MVM then filed two motions for summary judgment, the first focused primarily on the enclave clause, and the second claims that the company acted with good cause in terminating Gudarrama. The following are the relevant facts with regards to these allegations.

*Enclave Clause*

MVM is a private contractor providing security services for the at the GSA Service Center in Guaynabo. The GSA Center in Guaynabo was a part of Fort Buchanan Military reservation until it was transferred to the GSA in 1969. D.S.U.M.F. I & O.S.U.M.F. I, ¶ 2. On June 17, 1943, the United States government accepted exclusive jurisdiction over all lands acquired by it for military purposes within Puerto Rico. D.S.U.M.F. I, ¶ 4. This was reiterated in a letter by the United States Secretary of War on July 27, 1945. Id. at ¶ 4. During the 1960's, the military reduced the size of Fort Buchanan, and on May 20, 1969, the GSA took custody and accountability for a parcel of property, which had been received in transfer from the armed forces. Id. at ¶¶ 2 & 10. At present, the property in question is one of the significant GSA-owned and operated federal buildings in Puerto Rico. Id. at ¶ 13.

---

[1] More specifically the retaliation claim is based upon 29 U.S.C. § 215(a)(3), which makes it illegal "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA], or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee."

**CIVIL NO. 07-1468 (SEC)**                                                                                                        **Page 3**

*Retaliation and Discrimination Claims*

Before MVM terminated her employment, Guadarrama had never before received a written reprimand, or been subject to any other formal disciplinary proceeding. Docket 74-2 ("P.S.U.M.F. II"), ¶ 1. However, she had made two prior complaints before the Department of Labor ("DOL"). The first complaint was in September 2005, and it alleged that MVM had failed to pay her 120 hours of vacation and owed her Health and Welfare benefits. See Docket 62-2 ("D.S.U.M.F. II"), ¶ 9. Then again on February 21, 2006, she filed another complaint with the DOL, this time alleging that she was not being paid the correct hourly wage, that she was not receiving the correct pay differential for nighttime shifts, and that there was a problem with her uniform allowance. P.S.U.M.F. II & D.S.U.M.F. II, ¶ 12.

MVM terminated Plaintiff's employment on May 16, 2006, for irregularities in her time sheets. The company handbook states that the falsification of documents, or reports, was considered "conduct of such serious nature that an employee may be subject to summary dismissal, even on the first offence." D.S.U.M.F. II, ¶ 37-38. Furthermore, MVM asserts that subsequent to her dismissal Guadarrama needed to follow the internal grievance procedures outlined in the Collective Bargaining Agreement ("CBA"). D.S.U.M.F., ¶ 7. Accordingly, they argue that she has not exhausted internal remedies, and cannot bring the present claim. However, Plaintiff has presented evidence that the CBA expressly excludes discrimination claims. P.S.U.M.F. II, ¶ 4.

This Court finds that there is a legitimate issue of material fact in regarding the activities which led to Guadarrama's dismissal. Neither party disputes that there were irregularities with her timesheets. Nevertheless, Plaintiff alleges that MVM did not file its own procedures once the incorrect entries were detected. P.S.U.M.F II, ¶ 18. She also alleges that male security officers, and one female officer married

to another employee, engaged in similar conduct, but were not disciplined. P.S.U.M.F II, ¶ 24-32. Furthermore, this information is corroborated by statements made by other former employees. Id.

**Standard of Review**

The Court may grant a motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ramírez Rodríguez v. Boehringer Ingelheim, 425 F.3d 67, 77 (1st Cir. 2005). In reaching such a determination, the Court may not weigh the evidence. Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668 (1st Cir. 1994). Summary judgment "admits of no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails." Id. (citing Greensburg v. P.R. Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987). Accordingly, if the facts permit more than one reasonable inference, the court on summary judgment may not adopt the inference least favorable to the non-moving party. Id. at 684. At this stage, the court examines the record in the "light most favorable to the nonmovant," and indulges all "reasonable inferences in that party's favor." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

Once the movant has averred that there is an absence of evidence to support the nonmoving party's case, the burden shifts to the nonmovant to establish the existence of at least one fact in issue that is both genuine and material. Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (citations omitted). "A factual issue is 'genuine' if 'it may reasonably be resolved in favor of either party and, therefore, requires the finder of fact to make 'a choice between the parties' differing versions of the

**CIVIL NO. 07-1468 (SEC)**                                                                                                         **Page 5**

truth at trial.'" DePoutout v. Raffaelly, 424 F.3d 112, 116 (1st Cir. 2005) (citing Garside, 895 F.2d at 48 (1st Cir. 1990)); see also SEC v. Ficken, 546 F.3d 45, 51 (1st Cir. 2008).

In order to defeat summary judgment, the opposing party may not rest on conclusory allegations, improbable inferences, and unsupported speculation. See Hadfield v. McDonough, 407 F.3d 11, 15 (1st Cir. 2005) (citing Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Nor will "effusive rhetoric" and "optimistic surmise" suffice to establish a genuine issue of material fact. Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997). Once the party moving for summary judgment has established an absence of material facts in dispute, and that he or she is entitled to judgment as a matter of law, the "party opposing summary judgment must present definite, competent evidence to rebut the motion." Méndez-Laboy v. Abbot Lab., 424 F.3d 35, 37 (1st Cir. 2005) (citing Maldonado-Denis v. Castillo Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994). The "non-movant must 'produce specific facts, in suitable evidentiary form' sufficient to limn a trial-worthy issue...[f]ailure to do so allows the summary judgment engine to operate at full throttle." Id.; see also Kelly v. United States, 924 F.2d 355, 358 (1st Cir. 1991) (warning that "the decision to sit idly by and allow the summary judgment proponent to configure the record is likely to prove fraught with consequence."); Medina-Muñoz, 896 F.2d at 8 (citing Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)) (holding that "[t]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a fact finder must resolve.")

**CIVIL NO. 07-1468 (SEC)**                                                                                   Page 6

**Applicable Law and Analysis**

*FLSA and Law 115 Retaliation*

Because of their similarity, and parallel evidentiary mechanisms, this Court will discuss retaliation under FLSA and Law115 concurrently.

The First Circuit has established that a FLSA retaliation claim requires ". . . at a minimum, a showing that (1) the plaintiff engaged in a statutorily protected activity, and (2) his employer thereafter subjected him to an adverse employment action (3) as a reprisal for having engaged in protected activity." Claudio-Gotay v. Becton Dickinson Caribe, Ltd, 375 F.3d 99, 102 (1st Cir. 2004). Protected activity under the FLSA requires an employee step outside their normal role, which ". . . is satisfied by a showing that the employee took some action against a ... policy ... and that the action was based on a reasonable belief that the employer engaged in ... conduct contrary to the FLSA." Id. (citing EEOC v. HBE Corp., 135 F.3d 543, 554 (8th Cir.1998)). The standard under Law 115 is even more lax, because it broadly prohibits an employer from "discriminat[ing] against an employee regarding the terms, conditions, compensation, location, benefits or privileges of the employment should the employee offer or attempt to offer, verbally or in writing, any testimony, expression or information before a legislative, administrative or judicial forum in Puerto Rico." Sanchez Ramos v. Puerto Rico Police Dept., 392 F.Supp.2d 167, 179 (2005).

In the present case, Guadarrama clearly stepped outside of her normal role as a security guard to make complaints before the DOL, which, due to their close relationship with her wage and hour structure, allow for them to be reasonably ". . . directed towards the assertion of rights protected by the FLSA." Claudio-Goyay, 375 F.3d at 102. Therefore, this Court concludes she engaged in protected

**CIVIL NO. 07-1468 (SEC)**                                                                                       Page 7

activity. Accordingly, MVM must now proffer a legitimate, non-retaliatory, reason for her dismissal. Provencher v. CVS Pharmacy, 145 F.3d 5, 10 (1st Cir.1998). Furthermore, an employee must show causality, which in this case is demonstrated by the close temporal proximity between Guadarrama's second DOL complaint, and her eventually dismissal. Nevertheless, MVM maintains that Guadarrama was dismissed for a serious violation of company policy, and that forewarning of the possibility of summary termination is included in the employee manual.

Given the legitimate reason proffered by MVM, Guadarrama must show by a preponderance of the evidence that the proffered reason is merely a pretext and that the real reason was the employer's retaliatory animus. See Ramírez v. Boehringer Ingeleim Pharmaceuticals, Inc., 425 F.3d 67, 83 (1st Cir.2005); Franco v. Glazosmithkline, No. 06-1781, 2009 WL 702221,* 12 (D.P.R. Mar. 11, 2009). This has been achieved through the inclusion of testimonial evidence by her and other current and former employees, that other similar behavior was tolerated, and condoned.  Furthermore, "[c]ourts should exercise particular caution before granting summary judgment for employers on issues such a pretext, motive and intent." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 43, 55 (1st Cir.2000). Accordingly, MVM's motion for summary judgment of Guadarrama's retaliation claims is **DENIED**.

*Law 100*

Under Law 100, the plaintiff has two requirements to establish a *prima facie* case: "1) she must demonstrate that she was actually or constructively discharged; and 2) she must allege that the decision was discriminatory." Cardona Jimenez v. Bancomerico de Puerto Rico, 174 F.3d 36, 42 (1st Cir. 1999). This standard has obviously been met in the present action. Accordingly, "the burden shifts to the employer to prove by a preponderance of the evidence that it had 'just cause' for its actions. If the

**CIVIL NO. 07-1468 (SEC)**                                                                 **Page 8**

employer establishes just cause, the burden of proof returns to the plaintiff. If the employer fails to prove just cause, however, it bears the burden of proving by a preponderance of the evidence that the decision was not motivated by [sex] discrimination." Baralt v. Nationwide Mut. Ins. Co., 251 F.3d 10, 16 (1st Cir.2001) (internal citations omitted). However, if just cause is shown, the burden returns to the plaintiff to show that the employer's action was a pretext for its underlying discriminatory animus. Jiminez, 174 F.3d at 43; Alvarez-Fonseca v. Pepsi Cola de Puerto Rico Bottling Co., 152 F.3d 17, 28 (1st Cir.1998). "At summary judgment, this question reduces to whether or not the plaintiff has adduced minimally sufficient evidence to permit a reasonable factfinder to conclude that [she] was fired because of [her gender]." Garcia v. Bristol-Myers Squibb Co., 535 F.3d 23, 31 (1st Cir. 2008) (citing Dávila v. Corporación De P.R. Para La Difusión Pública, 498 F.3d 9, 16 (1st Cir.2007) (quotations omitted).

Pretext can be proved with evidence that the plaintiff received different treatment than her similarly situated peers. Garcia, 535 F.3d at 31-32. However, comparisons must "closely resemble one another in respect to relevant facts and circumstances." Id. (citing Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st Cir.1999)). Granted that the case at bar is a close call, but Guadarrama had no previous disciplinary record, there was an inconsistent supervision of the timesheets, and there is testimonial evidence that various male employees engaged in similar activity with impunity. Furthermore, summary judgment is not favored in Law 100 cases.

In light of the above, this Court concludes that a jury could find pretext in MVM's decision to summarily terminate Guadarrama. Accordingly, the motion for summary judgment as to Plaintiff's Law 100 claims is **DENIED**.

*The Enclave Clause*

MVM argues that Puerto Rico law does not apply to this lawsuit, because the land upon which

**CIVIL NO. 07-1468 (SEC)**                                                                                      **Page 9**

Guadarrama's claims accrued is an alleged federal enclave. Federal enclaves are created by U.S. Const. Art. I, § 8, cl. 17, which, grants Congress power:

> [t]o exercise exclusive legislation in all cases whatsoever, over such District (not exceeding ten miles square) as may, by cession of particular states, and the acceptance of Congress . . . and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings.

U.S. Const. art. I, § 8, cl. 17. Under the Enclave Clause, "federal ownership of land within a state does not, without more, imply either a total or partial corresponding transfer of jurisdiction[.]" Koren v. Martin Marietta Serv., Inc., 997 F. Supp. at 200 (quoting 40 U.S.C. § 255). Rather, a "state's consent to exclusive federal jurisdiction over the land acquired" by the United States is required, and "the federal government 'must indicate acceptance [of exclusive jurisdiction] to the governor of the state.'" Id. at 201 (quoting United States v. Johnson, 994 F.2d 980, 984 (2d Cir. 1993)). "The federal government may so indicate either formally, such as by proclamation, or 'by such manner as may be prescribed by the laws of the State where such lands are situated.'" Id.

In 1903, the Puerto Rico legislature passed a law allowing the establishment of enclaves with exclusive federal jurisdiction. Act of Feb. 16, 1903, 1903 P.R. Laws, p. 110 § 5 (hereinafter "Act of 1903"). As previously mentioned, on June 17, 1943, the United States government accepted exclusive jurisdiction over all lands acquired by it for military purposes within Puerto Rico, which was reiterated in a letter by the United States Secretary of War on July 27, 1945. D.S.U.M.F., at ¶ 4. This letter gave the federal government "exclusive jurisdiction over all lands conveyed to the United States for which such jurisdiction had not been accepted' under 40 U.S.C. § 255, and 'on August 10, 1945, the Governor of Puerto Rico signed this letter, confirming the Secretary of War's acceptance of jurisdiction.'" Koren, 997 F. Supp. at 201 (quoting Puerto Rico v. Koedel, 927 F.2d 662, 664-65 (1st Cir. 1991).

**CIVIL NO. 07-1468 (SEC)**                                                                                                   Page 10

  Accordingly, there is little controversy regarding whether the Fort Buchanon is a federal enclave. Nevertheless, given the subsequent transfer of the GSA properties, Guardarrama argues that said parcel reverted back to the Commonwealth's police power. This is possible under federal law:

> [n]otwithstanding any other provision of law, the Secretary concerned may . . . relinquish to a . . . Commonwealth . . . of the United States all or part of the legislative jurisdiction of the United Sates over lands or interest under his control in that . . . Commonwealth . . . . Relinquishment of legislative jurisdiction . . . may be accomplished . . . as the laws of the . . . Commonwealth . . . may otherwise provide.

10 U.S.C. § 2683(a) (emphasis added). Although the 1903 Act under which Fort Buchanon was acquired, stated that reversion would occure "upon the subsequent alienation by the United States of any land so acquired, the People of Porto [sic] Rico shall again have jurisdiction thereover," said statute was repealed in 1955 by a new section titled "Reversion of jurisdiction to Commonwealth," which states:

> [i]n the event that the United States ceases to be the proprietor of the lands or to be in possession of same, or **in the event that they are not used for the purposes for which they were acquired**, the Commonwealth of Puerto Rico shall again have jurisdiction over the same.

P.R. Laws Ann, tit. 28, § 57. Therefore, the present Puerto Rico law requires not only that the United States retain possession of the land in question, but also that it use such land for the purpose for which it was acquired. Although 10 U.S.C. § 2683 was passed in 1970, one year after the transfer of the property from the Army to the GSA, this Court considers that said statute directs this Court to interpret the transfer in light of the current applicable Commonwealth law.

  In effect, 10 U.S.C. § 2683 is a validation of P.R. Laws Ann. tit. 28, § 57, which was the law at the time of the transfer of the GSA parcel. Had the United States intended to maintain a coherent federal enclave, then it would not have transferred large portions of Fort Buchanan to other non-military agencies, and the Commonwealth, as it has done over the last 40 years. Furthermore, the 1945

acceptance of jurisdiction occurred in a purely military context. The First Circuit has found that "[i]t is common ground" that the letter of the Secretary of War on July 27, 1945 accepted exclusive jurisdiction of all lands in Puerto Rico theretofore transferred to the United States "*for military purposes and as to which jurisdiction had not previously been accepted.*" Torrens v. Lockheed Martin Servs. Group, Inc., 396 F.3d 468, 471 (1st Cir. P.R. 2005) (citing Koren, 997 F. Supp. at 200-201.)

The parties do not dispute that the land where the GSA Center is located was owned by the U.S. Department of the Army until 1969 when it transferred the site to the GSA. See Docket # 36-2, D.S.U.M.F. ¶ 2. However, MVM alleges it is still a part of Fort Buchanan Military Reservation. Plaintiff contests this assertion, providing evidence that it is now owned and controlled by the GSA. Docket # 41-2, P.S.U.M.F., ¶ 2. As a result, this Court concludes that Plaintiff's contention is correct.

There is case law stating that "[t]he sovereignty of the United States over property acquired pursuant to Clause 17 [of Article I, Section 8 of the United States Constitution] ends with the reasons for the existence of the power and the disposition of the property." United States v. Goings, 504 F.2d 809, 811 (8th Cir. 1974) (citing S.R.A. v. Minnesota, 327 U.S. 558, 564 (1946)); see also Koren, 997 F. Supp. at 207 (holding that "the Court believes it would be discrepant to apply today to a federal enclave acquired in 1955 a state law enacted in 1917 if the state itself repealed that law in 1956."). Accordingly, "[f]ederal jurisdiction, once properly obtained, does not necessarily persist in perpetuity. The federal government may surrender jurisdiction over state lands back to the state through a process known as 'retrocession' or 'recession'. . ." Atlantic Marine Corps Communities, LLC v. Onslow County, North Carolina, 497 F.Supp.2d 743, 755 (E.D.N.C. 2007).

When areas which became military enclaves in 1945 lose their military importance, the original reason for creating the enclave is moot. The importance of respecting local police power is especially

**CIVIL NO. 07-1468 (SEC)** Page 12

pertinent in the Commonwealth of Puerto Rico, where the relationship with the United States is governed by a bilateral compact. United States v. Vega Figueroa, 984 F. Supp. 71, 78 (D.P.R. 1997). Puerto Rico statutes and case law state " . . .[that] the controlling test of jurisdiction is the ownership or *possession* by the United States of the land ceded and the continuation of the use thereof for naval or military purposes and other public purposes for which they were acquired." P.R. Drydock v. Sec. of the Treasury, 85 P.P.R. 707, 713 (1962). Accordingly, this Court ". . . cannot ignore that the cession of jurisdiction cannot be divorced from the purpose for which said jurisdiction is exercised . . ." Id. at 714. This Court finds that applying reversion means the GSA compound will be ". . .subject to and benefit from a complete body of state law." Goings, 504 F.3d at 812.[2]  Therefore, MVM's motion for summary judgment on enclave grounds is **DENIED**.

**Conclusion**

For the reasons stated above, Defendants' motions for summary judgment are **DENIED**.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, this 31st day of March, 2009.

*S/Salvador E. Casellas*
Salvador E. Casellas
U.S. District Judge

---

[2] Roberts v. U.S.O. Council of P.R., 145 P.R. Dec. 58 (1998) refused to apply local labor laws to private entities operating within the Roosevelt Roads military enclave. See also Koren v. Martin Marietta Sercices, Inc., 997 F. Supp. 196, 207 (D.P.R. 1998). However, Lebron Diaz v. General Sec. Servs. Corp., 93 F. Supp. 2d 129, 141 (D.P.R. 2000) held that due to the Service Contract Act of 1956, 41 U.S.C. § 351 ("SCA"), "[t]he only reasonable inference to be drawn from the SCA is that local and state laws were to provide the foundation upon which the SCA was to be built, to insure that contract employees received certain minimum benefits." Notably, Roberts did not consider the SCA. Accordingly, in light of the SCA this Court is inclined to agree with the dissenting opinion in Roberts and with Lebron Diaz. See Roberts, 145 P.R. Dec. 58 (J. Fuster Berlingeri dissenting) (no page numbers available). However, as stated above, the present case is governed by the principle of reversion. As such, there is no need to come to a definitive conclusion as to the applicability of local labor laws to federal enclaves, because this Court concludes that the GSA compound is no longer a federal enclave.